# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LISA ANN DOBRECEVICH-VOELKEL,

        Plaintiff,

    v.                                   Case No. 09-C-367

MICHAEL ASTRUE,

        Defendant.

## DECISION AND ORDER

Plaintiff Lisa Ann Dobrecevich-Voelkel challenges the decision of the Commissioner of Social Security denying her disability benefits. She asserts that the administrative law judge ("ALJ") erred by failing to account for her serious migraine headaches. She also asserts that the ALJ erred in his assessment of Plaintiff's residual functional capacity, or RFC. Finally, she argues that the ALJ failed to recognize that the testimony of the vocational witness was unreliable and failed to properly assess Plaintiff's own credibility. For the reasons given below, the case will be remanded to the Commissioner for further proceedings.

## I. Standard of Review

In reviewing an ALJ's decision, a federal court examines whether it is supported by substantial evidence. *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An ALJ need not specifically address every piece of evidence, but must

provide a "logical bridge" between the evidence and his conclusions. *Id.* (citing *Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008)). An ALJ's credibility determination is entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castile v. Astrue,* 617 F.3d 923, 928-29 (7th Cir. 2010). "Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading." *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010). Accordingly, credibility determinations are reversed only if they are patently wrong. *Id.*

## II. Analysis

Prior to the present application, Plaintiff applied four times for Social Security benefits, all of which were unsuccessful. The ALJ noted that in each instance the state agency had found that Plaintiff could perform "other work." (Tr. 12.) In reviewing her current application, the ALJ found that the Plaintiff had a number of impairments, including: degenerative changes of the shoulders, knee joints, and feet; herniated discs; obesity; asthma; irritable bowel syndrome; hypercholesterolemia (high cholesterol); dysthymic disorder (a chronic type of depression); and post traumatic stress disorder. (Tr. 15-16.) At the time of the hearing, Plaintiff was forty-four years old. Medical records indicate that she smoked between a half-pack and a pack of cigarettes per day and weighed in excess of 200 pounds.

## A. Migraine Headaches

Plaintiff's first challenge is to a condition the ALJ left out of the above list, namely, migraine headaches. The ALJ considered Plaintiff's testimony that she had "bad" migraines three times a month, which required her to stay in a dark, quiet room until her migraine medication kicked in about two hours after onset. (Tr. 16.) The ALJ found that the medical record did not fully

support Plaintiff's testimony, however. First, he cited a 2006 visit to Dr. Rocke, whose notes reflect that although she cited a history of migraines, "from her description of the headaches, primarily frontal occipital in nature, described as being tight and from the previous medicine she has been on . . . it appear[s] that it would have more of a muscular component. She never has any photophobia, sonophobia. . . . She has no aura, no prodrome. No visual disturbances." (Tr. 214.) Thus, Dr. Rocke diagnosed tension headaches rather than migraines.

In December 2006, Plaintiff complained of daily headaches for "two or three weeks," and Dr. Haffar prescribed Depakote and a migraine medication. (Tr. 288.) But by August 2007, her only report of headaches was her complaint that they got bad when she coughed (she had been suffering from bronchitis). The brief physician's note for her August 2007 visit reads: "Lisa said that she has been having bronchitis for three months. Whenever she coughs, she gets severe headaches." (Tr. 290.) From this last sentence the ALJ appeared to conclude that she gets headaches *only* when she coughs, but Plaintiff points out that she still was subject to other headaches in addition to the ones brought on by coughing.

In October 2007, Plaintiff again presented with a complaint of "headache for 2 weeks." (Tr. 127.) Although she reported migraines and the doctor appeared to agree, she denied nausea, vomiting and vision changes. (Such symptoms typically accompany a migraine.) Finally, the ALJ noted that an MRI and CT of her head showed no pathology. For all these reasons, the ALJ concluded that headaches were not a medically determinable impairment.

Plaintiff is correct that the ALJ's analysis is not perfect. The statement that she got headaches after coughing does not mean she did not get headaches at other times as well. In addition, the fact that scans of her brain were unremarkable does not suggest an absence of

migraines, because migraines do not "show" in such tests. (The causes are unknown, but are thought to be chemical or be triggered by certain foods or other environmental factors.)

But perfection is not the standard an ALJ must meet. Instead, the ALJ's opinion must be supported by substantial evidence, and I conclude it is. The ALJ cited the opinion of Dr. Rocke, whose discussion of Plaintiff's headaches is the most extensive in the record. (In fact, it appears to be the only significant analysis of her headaches.) Dr. Rocke noted that the headaches Plaintiff was describing were tension headaches, not migraines. He observed that she did not experience any visual effects and her headaches had "more of a muscular component." (Tr. 214.) Her other visits to physicians described discrete periods of time (e.g., "two weeks") of headaches, rather than the chronic condition (three bad migraines per month) she described in her testimony. And in none of those physician visits did she ever describe typical migraine symptoms like nausea or visual effects, whereas during the hearing she testified that the migraines did make her "nauseous" and sensitive to light and sound. (Tr. 456.) There was no evidence in the record suggesting that the nature of Plaintiff's headaches changed between her visits to physicians in 2006-2007 and the 2008 hearing, and so the ALJ was correct to question the new, unsupported revelation that Plaintiff's headaches were typical migraines rather than the tension headaches she described to her doctors.

Plaintiff adds that even if the evidence of migraines was not fully supported, Plaintiff nevertheless did suffer from significant bouts with headaches (even if they were not migraines). But the evidence in the record suggests that there were discrete periods of time when she had headaches for a few weeks. Moreover, the notations in the record do not suggest that these headaches were debilitating or on the same level as a migraine, which can require several hours of isolation and effectively take a person out of commission. Finally, that is not what Plaintiff testified to. She did

not testify that she had non-migraine headaches, she testified that she suffered from migraines that produce sensitivity to light and sound and require her to go into a dark room. Plaintiff's testimony on the point was quite limited, however. Her attorney asked: "When you get these migraines, are you sensitive to light and sound?" She answered, "Yes." He then asked: "Okay. Do you get nauseous?" Answer: "Yes." (Tr. 456.)

Certainly it is possible for one's symptoms to change over time and for conditions to get worse between a claimant's physician visits and her hearing before the ALJ. But given the fact that there had been no previous reports of such symptoms anywhere in Plaintiff's fairly extensive medical record, one would think that there would have been more exploration of how these novel symptoms came about prior to the hearing. Instead, Plaintiff's cursory responses to her attorney's questions stand in stark contrast to her repeated denials of such symptoms in the medical record. The most extensive medical review in the file, from Dr. Rocke, concluded that Plaintiff did not suffer from migraines, and nothing else in the record supports the novel testimony that Plaintiff gave during her hearing. The ALJ was thus entitled to discount her testimony, and I am satisfied that the ALJ's treatment of Plaintiff's headaches was supported by substantial evidence.

## B. RFC: The ALJ's Reliance on Past Work

Plaintiff also argues that the ALJ's treatment of her residual functional capacity ("RFC") was deficient. First, she suggests that the ALJ erred in finding that she could do simple, repetitive tasks. Plaintiff testified that she had recently (September 2007) worked at Schwan's, the food delivery company, but only for a few weeks. She completed a three-week training program, which involved driving around (as a passenger) in the delivery truck. One week of training "was just sitting at a table," however. (Tr. 457.) After that, she drove the truck herself for two weeks before

she quit. She stated that it was hard getting into and out of the truck, and she packed bags so that they wouldn't be too heavy for her to deliver. The ALJ found that if she could successfully complete work training, including the week "just sitting at a table," then she could be expected to have the ability to perform at least sedentary work. (Tr. 25.) "Given her ability to complete training with Schwan's, and her testimony that this was not difficult for her, I conclude that mental symptoms, pain, and/or the side effects of medication do not prevent Ms. Dobrecevich from sustaining sedentary work on a regular and continuing basis." (*Id.*) The ALJ also noted that Plaintiff frequently drove 166 miles round-trip to see her mother.

Plaintiff asserts (briefly) that the ALJ erred in relying on the Schwan's job because the vocational expert testified that she had not worked there long enough to master all of the job skills involved, in particular, the ability to interact with customers. But that is a different question altogether. In this part of his RFC analysis, the ALJ was assessing the Plaintiff's physical abilities, and he simply concluded that her work at Schwan's – brief though it may have been – contradicted her assertion that she could do no work. She left the Schwan's job not because she was unable to work at such a job, *per se*, but because that particular job apparently required eighty hours of work per week. She testified that it was a "very stressful job," and she didn't want to be gone "from 6:00 in the morning and not return home until midnight, and then keep doing that on a five-day week, daily routine." (Tr. 439.) (Based on this, the ALJ also found that Plaintiff had a tendency to exaggerate.) In other words, her testimony made it seem as though she could work as a delivery driver, just not at the 80-hour-per-week clip Schwan's expected. If Plaintiff would have been able to keep up with a less stressful delivery job, the ALJ certainly was entitled to conclude that Plaintiff could perform sedentary work that didn't involve trucks or frequent lifting. Apart from the alleged

6

inconsistency with the vocational expert's testimony, Plaintiff identifies no other reason why the ALJ was not entitled to rely on her work at Schwan's.

## C. The Hypothetical Question Posed to the Vocational Expert

Plaintiff also argues that the ALJ failed to incorporate all of her mental impairments into the hypothetical questions he asked the vocational expert. Plaintiff had dysthymic disorder and post-traumatic stress disorder, and state agency consultants had concluded that she was moderately restricted in social functioning and had deficiencies in concentration, persistence or pace. Her mental RFC assessment, by Keith Bauer, Ph.D., also indicated that she would be moderately limited in carrying out detailed instructions and maintaining concentration for extended periods. She would additionally be moderately limited in her ability to maintain regular attendance or work without interruption. (Tr. 177-78.) Of the twenty categories on the mental health RFC form, Bauer found that Plaintiff would be moderately limited in seven of them. (*Id.*) But the ALJ did not incorporate these limitations into the hypothetical he asked the vocational expert; instead, he simply told the VE to assume that Plaintiff would be limited to simple, routine, repetitive tasks. (Tr. 463.)

Unfortunately, the ALJ's hypothetical, which limited Plaintiff's work to simple, routine tasks, does *not* serve as a substitute for the inclusion of the claimant's actual medical limitations into the hypothetical. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record.") In fact, the *Stewart* court awarded attorney's fees (it concluded the government's position was not just wrong but was not substantially justified) partly because it was firmly established that an ALJ cannot simply ask the VE to assume the claimant can do "simple, routine tasks" – he must ask the VE to assume the claimant suffers whatever actual

limitations are supported by the record (e.g., limitations in pace, persistence, etc.). *Id.* ("The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to "simple" tasks, and we and our sister courts continue to reject the Commissioner's position.") This is the situation we have here: a psychologist's RFC assessment includes seven moderate limitations, but none of these were incorporated into the hypothetical question or discussed by the ALJ.

There is an exception if the VE has independently reviewed the record and understands all of the claimant's relevant limitations. *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002). In such a case, we may presume that the VE has incorporated those limitations into the hypothetical asked by the ALJ. But this is not one of those cases. The VE testified that he had listened to the hearing, but no more. From that, he could not be expected to understand the specific mental health limitations identified by the reviewing psychologist. *Id.* ("nothing in the record reflects that the vocational expert independently knew of all the limitations related to Steele's depression that were omitted by the ALJ.")

This is not to say that the ALJ is bound by the medical evidence if he decides there are reasons to reject it. But the ALJ did not discuss the limitations found by Dr. Bauer and explain why he left these limitations out of the hypothetical. One could infer from his discussion of Plaintiff's mental health issues that the ALJ simply found them incredible or exaggerated. But making inferences from parts of an ALJ's opinion is seldom enough for a reviewing court to conclude that the proverbial "logical bridge" has been made. *Getch,* 539 F.3d at 480. And, in fact, the government does not argue that I should assume the ALJ rejected the Plaintiff's limitations; instead, it argues that "the ALJ addressed and accommodated these concerns in his RFC finding with the

limitation to routine, repetitive work." (Dkt. # 17 at 13.) (The argument the Seventh Circuit rejected (and awarded fees for) in *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)). Accordingly, there is no reason to attempt to salvage the ALJ's hypothetical by looking for evidence that he actually rejected the Plaintiff's limitations.

Even if I undertook such a task, however, the ALJ's rejection of Plaintiff's mental health issues would not be persuasive. (Tr. 23.) In discounting her mental health issues, the ALJ appeared to rely solely on the fact that during her visit with Dr. Paul in March 2008, she denied any history of depression or anxiety. (Tr. 23, citing Tr. 112.) On its face that seems a sound reason, but Dr. Paul is a neurosurgeon, and Plaintiff was visiting him to see if she was a candidate for spinal surgery. It is difficult to imagine that Plaintiff believed she should have raised her dysthymia/depression issues when she was seeking surgical treatment for back pain. Although a mental health question might have been part of the doctor's standard medical exam, I am not convinced that a single cursory notation in the report of a surgeon suffices to overcome the psychological limitations Dr. Bauer found. In fact, the record from Dr. Paul is not consistent with report of Dr. Krawiec, a psychologist who interviewed Plaintiff in connection with her disability application. Krawiec acknowledged Plaintiff's dysthymic disorder and PTSD (Tr. 262), and noted that her "mood disturbance is described as such that one would question her ability to consistently muster the energy and effort to get into and remain in the workplace." (Tr. 261.) He did opine that "her best chance for success would be with simple, redundant tasks in a low stress environment where rapid pace was not required," but that cannot be viewed as a ringing endorsement of her ability to work and does not undercut her mental health limitations.

9

A similar situation arose in *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). There, a non-reviewing psychiatrist found the claimant limited in functions similar to Plaintiff's limitations, but the ALJ did not address the psychiatrist's opinion:

> Dr. Tomassetti found Craft to be moderately limited in two of the B Criteria (social functioning and concentration, persistence, or pace), as well as moderately limited in the ability to understand, remember, and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday without interruptions from psychologically based symptoms, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. The ALJ certainly is entitled to give non-examining psychiatrist Dr. Tomassetti's opinion whatever weight that it is due; however, the failure to mention this detailed mental assessment is cause for concern.

*Id.*

The same holds true here. Two psychologists here concluded that Plaintiff had dysthymia and PTSD, and they further opined that her mental health issues would impose moderate limitations on her ability to maintain a consistent work schedule (among other things). Yet without addressing these pieces of evidence, the ALJ relied on a single note from a spinal consultation to discount all of her mental health limitations.

It is worth pointing out that this is not an academic exercise or mere nitpicking: the omitted limitations were obviously material. Upon questioning by Plaintiff's counsel, the VE conceded that someone who would be absent once a month would be considered unproductive and thus unemployable. The same was true if that individual needed three unscheduled two-hour breaks per month. (Tr. 466.) Moreover, if the individual performed at a pace that was twenty percent or more slower than what was expected, that individual would also not be employable. (Tr. 470.) These questions reflect the pace and attendance limitations that were found by the state agency physicians,

but they did not find their way into the ALJ's RFC hypothetical, and they were not persuasively discounted by the ALJ either. Accordingly, I agree with Plaintiff that the RFC analysis was flawed.

**D. Expertise of the Vocational Expert**

Plaintiff briefly argues that the VE was unqualified because he lacked knowledge about the number of jobs available in the local economy. In particular, she argues that the VE relied on the Dictionary of Occupational Titles, which is not reliable. He also relied upon the Wisconsin Office of Economic Advisor and the Wisconsin Office of Workforce Development for jobs numbers in Wisconsin, but, according to those entities' websites, these agencies do not produce such numbers.

During the hearing, the VE cited the DOT codes for the relevant jobs he believed Plaintiff could perform. That is common practice in benefits hearings, and in fact in some cases an ALJ has an obligation to inquire as to whether the VE's testimony about jobs differs from how those job are described in the DOT. *Harris v. Astrue,* 646 F. Supp. 2d 979, 995 (N.D. Ill. 2009). It is unclear how the ALJ would have erred by relying on the DOT when that publication is the basis for VE testimony as a matter of routine in Social Security cases.

**E. Plaintiff's Credibility**

Finally, Plaintiff challenges the ALJ's determination that she was less than credible. In reviewing an ALJ's credibility determination, a court must consider the following factors:

> The ALJ's credibility determinations are entitled special deference, *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000), but the ALJ is still required to "build an accurate and logical bridge between the evidence and the result . . . ." *Shramek*, 226 F.3d at 811 (internal quotation marks omitted). "In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." Id. (internal quotation marks omitted). Accordingly, we will overturn the ALJ's credibility

determinations only if they are "patently wrong." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).

*Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010).

The ALJ discounted Plaintiff's credibility for a number of reasons. First, he noted that Plaintiff had been fired from the only job she had ever held for more than a few weeks because she had misused an employee discount card. (Tr. 440.) The ALJ found that "this reduces her general credibility, as does the suggestion that she applied for the job with Schwan's without any intention of doing the work once training was completed." (Tr. 25.) Although misuse of a discount card is not a smoking gun of dishonesty, it was not unreasonable for the ALJ to note it. The ALJ also found that she claimed to use a walker 60 percent of the time, but nevertheless was able to work at Schwan's "80 hours a week" delivering food and riding around in a truck. Based on that obvious inconsistency, I conclude that it was sensible for the ALJ to find that "Ms. Dobrecevich tends to exaggerate." (*Id.*)

It is true that the ALJ used the phrase "not entirely credible," which is frowned upon in this Circuit because of its imprecision. *Martinez v. Astrue,* 630 F.3d 693, 696 (7th Cir. 2011). But that statement was harmless because the ALJ actually explained his reasoning for discounting Plaintiff's credibility. And none of those reasons were "patently wrong" such that reversal would be required for that reason alone. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).

## III. Conclusion

In sum, although many of the ALJ's determinations were not erroneous, I conclude that remand is required. The ALJ did not incorporate into the hypothetical vocational question the medical evidence suggesting that Plaintiff was moderately limited in seven mental health areas, and

neither did he adequately explain why (or that) he was rejecting that evidence. On remand, the ALJ must develop the record and incorporate Plaintiff's mental health limitations into her RFC (unless the ALJ concludes that the VE's testimony in response to Plaintiff's counsel's questions requires an award of benefits), or he must explain why he discounts those limitations.

The case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED** this __1st__ day of March, 2011.


 s/ William C. Griesbach     
William C. Griesbach
United States District Judge